Oral argument not to exceed 15 minutes per side, Mr. Bendure for the Plaintiff's Appellate. Good morning. May it please the Court I'd like to reserve three minutes for rebuttal if I may. Fine. As the Court is aware these are two consolidated cases involving Dow breast implants of several decades ago actually. In the Gatza case we have a statute of limitations issue regarding the application of the Wisconsin Limitation Period and Discovery Rule which requires that the plaintiff should know that the injury was probably, not possibly, probably caused by a specific product of an identified manufacturer. In this case what we have is testimony to the effect that she was told after having been previously advised by the man who implanted it and told her there was no problem, A-OK, by a subsequent treater who says it is possibly related to a breast implant. Our position is simply that possibly related to a breast implant does not meet the court standard of probably by a specific product and a specific manufacturer. We brief that. I'll be happy to answer any questions the Court may have but otherwise I'd rest on my brief. The common issue is the Court's denial of a motion which actually asked for two separate releases, reliefs rather. One is to modify the scheduling order and the second is to allow a belatedly identified expert witness. The Court first looked at the fact that Dr. Brower had provided expert testimony in prior litigation and identified that as a reason for denying the motions. When we say she simply got it wrong, under the cases that we've cited familiarity with the expert is a reason to allow it, not to disallow it. So our position is the judge clearly erred in taking the appropriate factor or inappropriate factor and simply putting it on the wrong side of the scale. But why, if everybody's familiar with Brower, why did your side not list Brower as a potential expert earlier on? Because they had initially chosen to go with three other experts. The record isn't clear why, whether or not they failed to contact Brower and chose to go with some others or whether they couldn't pay for him or whatever it might be. So why should one side have a second bite at the apple when their experts are denied under a Daubert analysis by the district court? So you had three and the district court refuses to allow those three to testify, so you have none. Then why should you be able to go to somebody that you knew about a long time ago and get a second bite at the apple? Nobody said we knew about him. We're talking about the defendant knew about him. But I thought you said that there was familiarity with Brower. Not by the plaintiffs. The record shows that the familiarity with Brower was by the defendant. Because Brower had testified in other cases or what? I believe so. Whatever they said is he had been identified as an expert witness and a researcher on the subject several years previously. So you're saying that the evidence that's in the records suggests that your plaintiffs did not know at all about Brower? It doesn't say one way or the other. Okay, but my question is still a question that I have, which is what is the law of the Sixth Circuit on whether a party whose experts have been denied under Daubert can go find a new expert? I think it is within the broader ambit of, first of all, good cause, or alternatively, whether it's harmless. Those criteria have been identified. There are three cases that made me have concern about this from the Sixth Circuit. One is Pluck v. BP Oil. One is Nelson v. Tennessee Gas Pipeline. And one is Pride v. BIC. And arguably, all of those seem against your position. And I wondered whether you have a case that says that this should be allowed or what you can say about those cases if you know about them. We certainly have some from other circuits that say it should be allowed. But the problem is these are Sixth Circuit published cases. I can see you could have a hypothetical where a hypothetical new expert has come up with a wonderful new way of studying a problem. And that way is agreed by everyone to be absolutely correct. Why shouldn't a district court have to reopen the discovery process and then consider this new expert? I think we're talking about two separate rules. First is the good cause for rescheduling. And we certainly have that because the previous scheduling dates had already passed. Yeah, but the rescheduling you want because of the expert, right? They were tied together, but the specific motion initially was to reschedule. And if the court had said we will reschedule, we then get to the issue of what are the rescheduling dates and what's included in rescheduling. So what other good cause did you have for rescheduling that you presented to the district court? Twofold. One is the expiration of prior scheduling dates. We had a... Why not just go to trial? Pardon me? Why not just go to trial? I thought you were close to trial and you had to stop because of bankruptcy, et cetera, et cetera. Well, no, that's not quite so. What we were getting close to trial was when the judge originally granted summary judgment on statute of limitation grounds. The original trial date was, I think, September of 2012. When we get back after remand, that's long gone. So it's inevitable that you have to reschedule. But the discovery deadline had long passed. It had, Your Honor. Okay. So what grounds would there be for reopening discovery that you presented to the district court that the district court abused its discretion in not considering? One is the additional literature and research in the field. And what's the interesting thing is the judge said you can't show that your expert relied upon that. And that's darn true. We could not in 2011 have relied upon literature that came out in 2013. But I thought it was that the new expert didn't. You don't have evidence the new expert relied on this. We don't know because we never got to the point of deposing. What we did do... You could talk to him and get his affidavit. What, that I relied upon these specific... Your expert. Yeah. I mean, you've identified Brower as being your guy. Correct. So you must have some reason for thinking he's going to be helpful to you. Certainly. So why not get an affidavit from him saying he's relied on all this new development in the field? It seems to me that's putting the cart before the horse to argue the merits of what he would testify to before actually allowing him to testify in the first instance. So all you have to do is point to somebody and say we want him and there has to be... Well, I mean, we actually, in our request to expand the record or to take judicial notice, point out that his most recent article was published this month. So we could not very well say I'm going to rely upon my own research and I'm going to publish it in the future. And so we have both of those as cause for rescheduling. But then we get to the harmlessness analysis of a belatedly identified witness. And one thing that strikes me as strange is if we had a prior identified expert who died, I don't think there's anyone in the world who would say that you shouldn't allow a replacement expert because he was made unavailable by death, or if he was comatose, or if he had moved to Australia. And it seems strange to suggest that the same situation... There's no lack of diligence there. Well, that's probably true, but I don't perceive this to be a punitive analysis. Indeed, look at the criteria the judge used. And again, harmless is the standard of the substituted expert. One thing the judge points to besides that he was known before is that this would delay things. Putting aside the fact that 10 years of delay was attributable to Dow and its bankruptcy, in another couple years, what would it have taken at the time this motion was argued? If the judge had orally said, you can identify Brower, we want the report and everything else in a month, and the defendant can have two months later to prepare and we depose him within three months. If the judge had done that, that would have been in the bank before she even issued the opinion. If you were allowed to bring Brower in, surely they would be allowed to scan the field of new experts and bring in a new expert. So then we've got, let's say, another three months. One month for them to identify him, two months for us to depose him. That would have been, at the same time she actually issued her opinion, there would still be two months in that entire process, and we hadn't even set a trial date yet. So that, in my view, would not have delayed the trial, aside from the fact that every such motion involves delay. Are you arguing the harmlessness now? We're arguing harmlessness right now under Rule 37. Getting that out of Rule 37? Yes, sir. And you didn't raise that to the district court? We did argue that they ought to allow a new witness who had not been disposed. Did you mention Rule 37 to the district court? I don't believe 37 was mentioned by name. Isn't that sort of raw to the district court to reverse if we take your position on an issue that was not presented to the district court? Well, the issue was... That whole problem with forfeiting... The issue... Go on, Your Honor, I'm sorry. Let's let Judge Rogers finish. You're saying that you're relying on harmlessness. It's a standard that comes from Rule 37, which you say should apply. There are arguments against it. If we were to reverse, we would be reversing the district court on an issue that was not presented to the district court, which is normally not what we do. How do you respond to that? We're not... This was an issue that was presented. Rule 37 was not identified by name. How could it have been presented? I don't understand how you can... Or maybe you should present it now without referring to Rule 37. I don't know. Well, what we said was, Your Honor, this is... This should be allowed. I understand, but now you're using an argument in support of that which says that it would be harmless. And harmlessness supports allowing it. But you get that from a rule that you never... The district court never got a chance to examine that. The rule may not have been cited, but the argument was made. That's the distinction I would draw. We said you should allow this previously undisclosed witness. And the court rule which addresses that issue specifically is 37. We might not have connected the dots in that fashion, but we did present the issue itself. And, in addition, it goes together with the reopening. And that was the specific purpose under the other rule. May I proceed, Your Honor? Please. Good morning, Your Honors. My name is Barry Fields, and I represent the DCC Litigation Facility. May it please the court. In looking at the issues here, as is very clear, there are two fundamental issues. The first issue is, of course, whether or not the district court abused its discretion in refusing to reopen expert discovery. And the second issue was whether or not the district court improperly granted summary judgment to the DCC Litigation Facility on Mitzgatza's claim. And that was an independent reason for granting summary judgment in addition to the lack of causation evidence. I'd like to first turn to the first issue, which has to do with Rule 16. I think it's important to recognize what happened in the case. Obviously, once the case came back from the Sixth Circuit, the two cases came back from the Sixth Circuit, the district court was going to pick up where it left off. But the plaintiffs, or Mitzgatza and Ms. Sutherland, and their new counsel obviously had a different idea. Instead of picking up where we left off, which would be going back, expert discovery had closed, fact discovery had closed, and we were now dealing with dispositive motions and a potential trial if the dispositive motions were not granted, the new counsel approached it somewhat differently. For instance, one of the things that they suggested is they should be allowed in the Sutherland case to file an amended complaint to add a new punitive damages claim. The court denied that, and that's not on appeal. They also came in and suggested that they wanted to reopen both fact and expert discovery. So basically, they wanted to start this case from anew. Now, it is true that eventually what they did was to suggest that we're not going to attempt to reopen fact discovery. We want to just reopen expert discovery. And how much time had passed then from when the close of expert discovery was to when they're seeking to reopen? What were the dates? The close of expert discovery was in 2012, and I don't remember exactly what month in 2012, but it was in 2012. And then they're coming back in what year? They're coming back in 2015. They filed their motion to reopen fact discovery and expert discovery in 2015. So suppose, hypothetically, that there was new discoveries concerning the impact of silicone breast implants on women, that everybody in the scientific community agreed that these implants were causing all of these autoimmune diseases. Suppose that is a hypo, and I understand that is not what you think the situation is. Shouldn't the plaintiffs in a case be able to produce a new expert who can testify on this new scientific discovery that everybody in my hypo, everybody agrees is true? I think it depends, Your Honor. For instance, you could have a situation where there was new scientific literature that came out, and that new scientific literature came out, for instance, after 2012. If that new literature was material, then obviously you had three experts that the plaintiffs have already identified who, if it was determined that their opinions, either given in the report or at the expert deposition, was now materially incomplete or incorrect, then under the federal rules there would be an opportunity to supplement. One of the things that really gets lost, I think, in the appellant's argument is they fail to recognize that they had three experts that they had previously designated on causation, Dr. Blay, Dr. Feichner, and Dr. Bush. And those experts hadn't been rejected under a Daubert analysis when the case went back in 2015? That's correct. We had previously, before the cases went up, the litigation facility had previously filed Daubert motions for those particular experts, but the district court did not reach those motions because it determined that there was a separate ground for... Which was the statute of limitations. The statute of limitations. Right, and then our court said wrong state was being used, sent it back to the district court. That's correct, Your Honor. And so as a consequence, those three experts were causation experts, and those experts, if they believe this literature that is being cited by the plaintiffs in their briefs was somehow material information that affects their opinion, then they could have requested permission to supplement their expert opinions. They didn't do that. As a matter of fact, as we point out, not only do we have any evidence that Dr. Brower has reviewed or relied on any of this literature, there's no indication that any of their experts, including their earlier causation experts, have looked at any of this literature. In this literature now, you're talking about actual, as opposed to my hypo, that there was some development of literature during this approximately three-year period, and that could have been used in a motion to supplement the existing three proposed experts. Correct. As we indicated, Your Honor, obviously in science there continues to be research that is being performed by different scientists, and those scientists publish different articles about their research. And here we point out that although they cite a number of different articles, many of those articles don't even have anything to do with the injuries that the plaintiffs are dealing with. Had Brower actually testified in any case that you are aware of? I know he, back in the 1990s, we did find one or two cases where he clearly testified. I did not scour the dockets to see, but I'm not aware of him testifying in the last 15 or so years in any breast implant litigation. But I think Your Honors, in the earlier question, sort of picked up on one of the points that was key, which is they sort of suggested that, in fact, their familiarity with Brower by, hypothetically, the litigation facility, is a reason to allow him. But when you look at the law, even if you're talking about familiarity under the harmless standard, it's not simply that you know the expert exists, that you know this is a person that actually has performed some research in the area. Even if the litigation facility had this information and knew this information, that's not sufficient. The cases are really trying to determine whether or not the non-moving party has sufficient evidence as to the substance of the information that has not previously been disclosed. So simply knowing that an expert exists, the name of the expert, et cetera, is not sufficient even under the harmlessness standard. But practically, what is really the harm if this had gone smoothly in the district court, where your opponent brings up Brower, says he wants to have Brower considered as an expert. Your opponent says it would only have taken a couple months on their side and maybe double the number of months on your side, and this case has already staggered on for several years. Why not allow further development of Brower? Your Honor, I think one thing that is important is again to look back at the context. The way they have characterized, the way the appellates have characterized their requests now before this court is they were only seeking to name one additional expert. And what's the harm with seeking to add one additional expert? When you look at the record, however, it is very clear that it wasn't simply to name one expert. Their motion was to completely reopen discovery, and they did not identify how many additional experts they wanted to name. So they've recast the argument before this court, but it was a request to reopen expert discovery completely. And was it just expert discovery or was it fact? It was originally their original motion, which was filed under Rule 16, was for both fact and expert discovery. Once they learned that, in fact, the court had already rejected in the later Ezra case, had rejected these three experts under Daubert, they then recast and limited their motion. But it still was not just simply to name one expert. It was actually to reopen expert discovery. With respect to Your Honor's question, the issue is not only would we reopen discovery, so they would obviously have the opportunity to name one or more additional experts. Then it would be the litigation facility would then have to look at the opinions that were disclosed by these experts and then determine whether or not their three experts, the litigation facility had three experts, whether those three experts would continue to, would need to supplement or issue new opinions. Depending on which experts were named, it's possible that there would need to be, the litigation facility would need to hire new experts. And so it would be a complete reopening of discovery, a complete set of new experts for the appellants, as well as potentially new experts or at least new opinions from the litigation facility. And hypothetically, if one or more of these new experts from either side had really profound information, really probative information, you would hope that there would be some mechanism in the civil rules that would allow for reopening and that you wouldn't be stuck with the fact record, the expert record that's established as of 2012 when you're trying the case in 2017. But I guess the question is what mechanism allows for that and was that properly informed? I think there are two potential mechanisms. One we talked about earlier, and that is a mechanism to supplement the opinions. And so, for instance, they had three causation opinions, three causation experts, including a rheumatologist. And so if there was this new groundbreaking research or literature, they could come into the district court and demonstrate to the district court that this is material information that needs to be added to the record, and so they would be able to do it through supplementation. There's also the potential, obviously, if they could demonstrate that, in fact, because this researcher perhaps wasn't known or because this researcher was performing research that was not known, then that could satisfy the good cause standard that exists under Rule 16. But we have a different issue here, obviously. One of the things that is very important is that they were attempting to establish good cause, and under the good cause under Rule 16, it's important to demonstrate that there was reasonable diligence in order to disclose the experts, and they were not able to demonstrate to the district court that there was reasonable diligence, and the district court noted that. Obviously, under Rule 16, there is this notion of considering prejudice as well, and that is that if, in fact, you have established reasonable diligence, then what you would do as a district court is that you would then look and say, even if the moving party has demonstrated reasonable diligence, is there prejudice to the non-moving party? And the prejudice would really be the time delay and the cost? It would be the resources, time, and cost, and when you look at decisions such as the cases that Your Honor pointed to earlier, whether you're talking about the Nelson case,  they're looking at different issues and prejudice, and I think the other thing that is important about those decisions is they addressed one of the issues that was raised by this panel, which is if you have a situation where you've already been given the opportunity to name your experts, and you were given that opportunity after multiple extensions of the district court, you name those experts, those experts disclose those opinions, those experts were deposed, and now you're subject to Daubert, and you know you're subject to Daubert, do you get the opportunity for a do-over because they're about to be excluded? And in those cases, they make clear that fairness does not dictate that you get a second bite at the apple. Are there other circuits that take a different approach on that? It seems so harsh to have that rule that the Sixth Circuit has, and I'm just wondering whether other circuits have more leniency. Well, I recall there are some circuits that when they're looking at Rule 16, what they will do is look at a variety of different factors, including whether or not, for instance, what's the prejudice to the party, was there any surprise to the non-moving party, what's the justification? So they're looking at different factors, but at the end of the day, you're still looking at whether or not there was reasonable diligence on the part of the moving party. If you're just looking at prejudice, you could imagine having a rule that if it's going to cost the opposing party a certain amount of extra money, that the plaintiff could have to pay the defendant for that extra time involvement and pay attorney's fees for the extra time. And if the expert is that important to the plaintiff because they've lost with their three experts being rejected, then why not have that kind of a rule? Because it seems like a plaintiff or a defendant, which goes to both sides, could easily make a mistake as to what the district court is going to require their experts to be able to say. And then the party could easily be able to cure that by finding another expert who can say this missing piece. And so shouldn't any side, the defense or the plaintiff, be able to come back with a new and better expert to fill in the gaps that the district court identifies under Daubert? I think that would only be the case if the moving party had demonstrated reasonable diligence in order to comply with the earlier scheduling deadline. You don't get to prejudice. You don't get to prejudice. And as a matter of fact, there's some case law that actually sort of takes the line that if you've determined that, in fact, there has not been diligence, then you don't need to get to the prejudice issue. You only get to the prejudice issue if you've determined that the moving party has exercised reasonable diligence. And here it is clearly under Rule 16. That's what they presented to the district court. They didn't refer to Rule 37. And so the analysis is under Rule 16, and they have not demonstrated reasonable diligence under Rule 16. Thank you. Can I ask a question that is formally totally not relevant to the case, but I'm curious? What exactly is a litigation facility? I mean, if you win some billion-dollar lawsuit or if you lose, where does that money come from? So as part of the reorganization, there were sort of two facilities that were created. There was a settlement facility, which was the facility that is involved in paying any settlement claims, and then there's a litigation facility. So for those individuals who opted out of the settlement, then they are litigating against the facility, and that litigation facility would be responsible for litigating and paying those claims. But where does the money come from? Is there some limit on the amount of money? If a huge judgment goes against you, does it ultimately go to the shareholders of Dow Corning, or does it come out of a limited pool, some of which would go to pay others, or what? Your Honor, I don't know the answer to that question. I'm happy to try to get the answer. That's your ultimate client, though, right? I mean, the ultimate people who are going to win if you win is the answer to that question. But you really don't know. You're just litigating away. Well, what I don't know is, for instance, if there is an award, whether it comes out of a preexisting pool or not. Obviously, what I do know is that this facility was created to litigate and to resolve claims, and they can resolve claims, including... Understand that it says incorporated here. That's what I thought. Are there shareholders of the litigation facility? It is a wholly owned subsidiary of Dow Corning Corporation. So if this thing loses money, Dow Corning loses money and vice versa? Or is there some pool that will go somewhere else if it doesn't go to this plaintiff? Well, I know there's a pool for... I know there's a pool under the bankruptcy process. I just don't know how that is related to claims that eventually are paid for judgments against the litigation facility. But you're with a private law firm. Yes, Your Honor. Oh, yeah, I understand that. And you're litigating it the same way you would litigate it if it was just a suit against Dow Corning, I guess. That's correct, Your Honor. Thank you. Thank you. Mr. Grandjuror. Thank you. When you're looking at the issue of diligence, I think it bears mention that the first status conference following the court's reversal, we indicated to the trial judge our intent to file a motion for new experts. At that time, their Daubert motion was not yet in the hopper. Now, it had been raised the first time, and we were looking ahead of that. But the point is that this motion was made before their Daubert motion that they prevailed on had been filed. So we suggest that we've been as diligent as possible. Why did the district court say that you weren't diligent? I don't think the court addressed the issue of diligence so much as saying that Brower had testified before, and she cited the delay and the expense. Now, it also bears note that there's no prejudice expense-wise if we had identified him earlier. They still would be taking his deposition, and that cost would still exist whether we identified him now or three years ago. So put that aside as an element of prejudice. What happened when the case was remanded back is there were still loose ends. We had pending a motion to compel and a motion to allow the deposition of Dau experts. And what occurred was we tried to simplify it and get it rolling. It's true that the original motion was broader than what happened, but if you look in the record, you'll find that we filed a supplement or a reply. I'm not sure exactly how it was noted. What we said was we don't need additional fact discovery. We'll forego our motions that had been pending to compel, and for things like that we identified Brower by name as the only additional expert that we sought. So by the time it actually came to argument of this motion, we were simply talking about Brower as an added expert and in the process giving up some of the other issues that might have been litigated because they were pending loose ends. In terms of the funding, here's my understanding for what it's worth. As part of the Dau bankruptcy, they created the facility and they endowed it with a fund of some number of billions of dollars. And then, according to my understanding, that's used for defense costs and any judgments against them, and when everything's settled, whatever's left goes back to Dau, or by now its successors since the merger of DuPont. For what it's worth, that's my understanding. Thank you. If the Court has any other questions, I'll be glad to address them. Thank you. Thank you very much. Thank you both for your argument. The case will be submitted, and with the clerk.